UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DEBORAH PUCKETT,                  :        Case No. 1:08-cv-771
                                  :
        Plaintiff,                :        Judge S. Arthur Spiegel
                                  :        Magistrate Judge Timothy S. Black
vs.                               :
                                  :
COMMISSIONER OF                   :
SOCIAL SECURITY,                  :
                                  :
        Defendant.                :


**REPORT AND RECOMMENDATION[1] THAT: (1) THE ALJ'S NON-
DISABILITY FINDING BE FOUND SUPPORTED BY SUBSTANTIAL
EVIDENCE, AND AFFIRMED; AND (2) THIS CASE BE CLOSED**

        This is a Social Security disability benefits appeal.  At issue is whether the

administrative law judge ("ALJ") erred in finding Plaintiff "not disabled" and therefore

unentitled to disability insurance benefits ("DIB").  (*See* Administrative Transcript ("Tr.")

(Tr. 19-43) (ALJ's decision)).

                                    **I.**

        On October 10, 2002, Plaintiff filed an application for DIB alleging that she

became disabled on May 31, 2001[2] due to asthmatic bronchitis attacks and trouble

walking and standing.  (Tr. 77, 93).

_____

        [1]  Attached hereto is a NOTICE to the parties regarding objections to this Report and
Recommendation.

        [2]  Plaintiff's alleged disability onset date was later amended to September 12, 2002.  (Tr.
19).

Upon denial of her claims on the state agency level, she requested a hearing *de novo* before an ALJ. (Tr. 56, 62, 65). A hearing was held on June 3, 2004, at which Plaintiff appeared with counsel and testified. (Tr. 836).

On October 15, 2004, the ALJ entered his decision finding Plaintiff not disabled. (Tr. 358). Plaintiff appealed and the Appeals Council remanded her case back to the ALJ. (Tr. 359, 361). A supplemental hearing was held on May 22, 2007, where Plaintiff appeared with her attorney and testified before the ALJ. (Tr. 836). A psychological and vocational expert also testified at the hearing and a medical expert testified via telephone conference call. (Tr. 19).

On February 27, 2008 the ALJ issued his decision denying Plaintiff's disability application. (Tr. 16, 43). That decision became the final determination upon denial of review by the Appeals Council on September 4, 2008. (Tr. 8).

Plaintiff has a high school education, and was 49 years old at the time the ALJ's February 2008 decision became the Commissioner's final decision. (Tr. 8, 77). Plaintiff had past relevant work experience as a nurses aid, a cook, and a laundry manager/dry-cleaning assistant. (Tr. 106).

The ALJ's "Findings," which represent the rationale of his decision, were as follows:

1. The claimant met the disability insured-status requirements of the Social Security Act on May 31, 2001, the date she originally stated she became unable to work, and continued to meet them through December 2006.

2.  The claimant has not engaged in substantial gainful activity since September 12, 2002, the amended alleged disability onset date.

3.  The medical evidence establishes that the claimant has the following "severe" impairments: lumbar degenerative disc disease with morbid obesity, a depressive disorder NOS, and an anxiety disorder NOS.

4.  The claimant does not have an impairment or combination of impairments listed in, or medically equal to one listed in, Appendix 1, Subpart P, Regulations No. 4.

5.  The claimant's subjective allegations lack credibility to the extent that they purport to describe a condition of disability within the meaning of the Social Security Act and Regulations.

6.  The claimant lacks the residual functional capacity to: (1) lift more than ten pounds, either frequently or occasionally; (2) sit for longer than thirty minutes at a time but is able to sit for at least six hours total in a work day; (3) stand and/or walk for longer than thirty minutes at a time or two hours total in a work day; (4) crawl, climb, crouch, stoop, or kneel; (5) perform work requiring use of foot controls; (6) work at unprotected heights or around moving machinery; (7) perform work involving exposure to temperature extremes or wet or humid areas; (8) perform work involving significant exposure of the body to vibration; (9) perform work requiring that she have more than occasional contact with the public; (10) perform work requiring her to follow complex instructions; or (11) perform other than low stress jobs (i.e., no job involving fixed production quotas, rapid production pressure, or otherwise involving above average pressure for production, work that is other than routine in nature, or work that is hazardous) (20 CFR 404.1545).

7.  The claimant is unable to perform her past relevant work as a pie or pizza maker, or as a laundry attendant.

8.  The claimant's residual functional capacity for the full range of sedentary work is reduced by the limitations set forth in Finding No. 6.

9.  The claimant was born on April 21, 1959. At all times relevant to this decision, she has been a "younger individual," as defined for Social Security purposes (20 CFR 404.1563).

10.     The claimant has a high-school education (20 CFR 404.1564).

11.     The claimant does not have any acquired work skills which are "transferable" to other jobs within her residual functional capacity (20 CFR 404.1568).

12.     Based on an exertional capacity for sedentary work and the claimant's age, education, and work experience, section 404.1569 of Regulations No. 4, and Vocational Rules 201.28 (as a younger individual age 18-44) and 201.21 (as a younger individual age 45-49), Table No. 1, Appendix 2 to Subpart P of Regulations No. 4, would direct a conclusion of "not disabled."

13.     Although the claimant's additional functional limitations do not allow her to perform the full range of sedentary work, using the above-cited Vocational Rules as a framework for decision making, there are a significant number of jobs in the national economy which she could perform at the sedentary exertion level.  Examples of such jobs are: table worker, nut sorter, and addresser.  There at [*sic*] least 3,200 such jobs in the region surrounding Dayton, Ohio, a region that contains jobs that exist proportionately at the national level.

14.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(g)).

(Tr. 41- 43).

In summary, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations and was therefore not entitled to DIB.  (Tr. 43).

On appeal, Plaintiff argues that: (1) the ALJ erred by failing to give controlling weight to her treating physicians; (2) the ALJ erred by giving inadequate consideration to her credibility; and (3) the ALJ erred by relying on an improper hypothetical to the vocational expert which did not constitute substantial evidence of her vocational abilities.  Each argument will be addressed in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, she must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

**A.**

For her first assignment of error, Plaintiff maintains that the ALJ erred by failing to give controlling weight to her treating physicians.

The record reflects that:

**Physical Health Evidence**

In September 2002, Plaintiff sought emergency treatment for low back pain that had been radiating into her hips for one week. (Tr. 181). Plaintiff had tenderness in her lower back, but straight leg raising test was negative and knee reflexes were normal. (*Id.*) X-rays showed degenerative disc disease in Plaintiff's lumbar spine (lower back) at the T12-L1 and L5-S1 levels. (Tr. 181, 213). An MRI showed a moderate sized left of center disc protrusion at the L5-S1 level that was affecting the tissue surrounding the spinal cord and the nerve exiting to the left at that level. (Tr. 212). The MRI also showed narrowing of the spinal cord, which was mild to moderate at the L4-5 level and mild at the L5-S1 level, and osteoarthritis. (*Id.*) In November 2002, William Glickfield, M.D., diagnosed Plaintiff with lumbar spinal stenosis, and opined that she was currently unable to work. (Tr. 210-211).

In January and February 2003, David Chow, M.D., treated Plaintiff for low back pain. (Tr. 231-234). Dr. Chow diagnosed Plaintiff with radiculopathy (nerve-root disease) in her left lower back due to the L5-S1 disc protrusion, lumbar internal disc disruption syndrome, and deconditioning with muscle tightness. (Tr. 233). On exam,

Dr. Chow found that Plaintiff was five feet, eight inches tall, weighed 340 pounds, had restricted range of motion in her lower back, but full range of motion in her arms and legs, normal muscle strength, sensation, and reflexes, and her "[h]eel, toe, and tandem walking were within normal limits." (*Id*.) Dr. Chow gave Plaintiff a steroid injection for her pain. (Tr. 231).

In March 2003, Plaintiff began seeing Mervet Saleh, M.D., on a monthly basis for pain in her lower back and legs. (Tr. 308). Plaintiff reported that without medication, her pain was a 9 on a scale of 1 to 10, but was a three with medication. (*Id*.) She reported that after one minute of either sitting, standing, or walking, she experienced severe pain. (*Id*.) As of her May 2003 exam, Plaintiff had decreased muscle power and positive straight leg raising test. (Tr. 309).

In April 2003, Dr. Saleh opined that Plaintiff had lumbar radiculopathy that rendered her unable to work. (Tr. 324). In June 2003, Dr. Saleh opined that Plaintiff was totally disabled and would need to undergo future therapy to improve her condition. (Tr. 309).

Also in June 2003, Willa Caldwell, M.D., a state agency medical consultant, reviewed Plaintiff's medical records and concluded that Plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds, could stand and/or walk for six hours, could sit for six hours, and was limited in pushing and pulling with her legs. (Tr. 303). Dr. Caldwell's limitations were based on Plaintiff's obesity and lower back strain. (*Id*.)

She cited the x-rays showing degenerative disc disease in Plaintiff's lower back and Plaintiff's reports of tenderness, along with testing that showed a negative straight leg raise and normal reflexes. (*Id.*) Dr. Caldwell further opined that Plaintiff could frequently balance, kneel, crawl, and climb ramps and stairs, and could occasionally stoop and crouch, but should never climb ladders, ropes, or scaffolds, and should avoid all exposure to fumes, odors, dust, gases, and poor ventilation. (Tr. 304-305). Dr. Caldwell noted that Plaintiff's alleged limitations were only partially credible. (Tr. 306).

In September 2003, Dr. Saleh opined that Plaintiff had lumbar radiculopathy that rendered her unable to work for more than 12 months. (Tr. 323). In May 2004, Dr. Saleh opined in a letter that contained essentially the same language and findings as the June 2003 letter, that Plaintiff was totally disabled. (Tr. 308, 321). In May 2004, John Grans, M.D., completed a basic medical form in which he recommended similar limitations. (Tr. 325). In June 2004, an MRI of Plaintiff's lower back again showed the L5-S1 disc protrusion, and also showed stenosis at the T11-12 level. (Tr. 339-340).

In July 2004, Gary Ray, M.D., examined Plaintiff at the request of the Social Security Administration and diagnosed her with severe central stenosis with cord compression at the T11- 12 level, and a left L5-S1 disc protrusion that was causing stenosis and inflamation of the L5 nerve. (Tr. 329). Plaintiff reported to Dr. Ray that steroid injections, use of a transcutaneous electrical nerve stimulation (TENS) unit, and medication all helped lessen her pain. (Tr. 327). On physical exam, Dr. Ray found that

Plaintiff could go from sitting to standing independently, and could walk with a mild left antalgic gait pattern using a cane in her left hand. (Tr. 328). Plaintiff had mild tenderness in her middle back and severe tenderness in her lower back, but Dr. Ray saw no muscle spasms and straight leg raising test was negative. (Tr. 328-329). Dr. Ray noted that Plaintiff displayed many pain behaviors, such as exerting poor effort, giving away, moaning and groaning, and complaints of pain, which made it difficult for Dr. Ray to perform parts of his exam. (Tr. 329, 333).

Dr. Ray opined that Plaintiff could frequently and occasionally carry up to 10 pounds, could stand and/or walk up to two hours, and could sit up to six hours. (Tr. 334). Dr. Ray opined that Plaintiff should never climb, balance, stoop, crouch, kneel, or crawl. (Tr. 335). Dr. Ray noted that Plaintiff's limitations resulted from her low back and left leg pain, tenderness, limited motion, weakness, and her back condition as noted in the June 2004 MRI. (Tr. 334). He also indicated restrictions with respect to heights and moving machinery, dust, fumes, and vibration. (Tr. 335).

An MRI of Plaintiff's thoracic spine (mid-back) taken in August 2004 showed multilevel degenerative changes, with the greatest degree of neural compromise being at the T6-7 and T10-11 levels. (Tr. 337-338). In October 2004, Scott West, D.O., evaluated Plaintiff and found that she had tenderness in her lower lumbar region with reduced range of motion and reflexes, with some sensory deficits. (Tr. 392-393). Straight leg raising test was positive bilaterally, but muscle function was good. (*Id.*) Dr. West opined that the August 2004 thoracic MRI showed some compression at the T6-7 and T10-11 levels,

and the June 2004 lumbar MRI showed some stenosis at the T11-T12 level and a disc protrusion at the L5-S1 level, which caused some bilateral nerve root compression. (Tr. 393). Dr. West recommended that Plaintiff exhaust all conservative care, and only consider surgery if her pain became "absolutely intolerable." (*Id.*)

In Dr. Saleh's monthly examinations of Plaintiff from October 2004 through December 2006, Dr. Saleh consistently diagnosed lumbar spine problems, finding that Plaintiff had decreased range of motion in her back, decreased muscle power in her legs, positive straight leg raising tests bilaterally, and normal to reduced reflexes. (Tr. 396, 400, 405, 409, 413, 418, 425, 514, 522, 536, 543, 562, 580, 594, 601, 616, 621, 634, 645, 658, 661, 668, 674). During this time period, Plaintiff used a TENS unit, and received therapeutic blocks and pain injections, which gave her some relief. (Tr. 398, 406, 411, 415, 420, 427, 516-517, 523-524, 530, 532, 535, 543, 553-554, 580-581, 588, 594, 601, 614, 629, 632, 642, 645, 653, 661, 669, 675).

A March 2006 MRI of Plaintiff's lower back showed a disc protrusion at L5-S1 that was causing significant central canal compromise with lateral recess stenosis bilaterally and impingement of the S1 roots. (Tr. 507). Plaintiff had mild to moderate stenosis at the L4-5 level, which appeared stable. (*Id.*) Plaintiff also had a small disc protrusion at L3-4 with some effacement of the left L3 nerve root. (*Id.*) The MRI also showed the degenerative changes at T11-12 that were shown in a previous MRI, but the changes in the current MRI did not appear as bad as on the previous image. (Tr. 506-507).

Dr. Saleh opined in an April 2006 letter that Plaintiff continued to be totally disabled and, with or without treatment, her condition would continue to progress and decline. (Tr. 505). His exam findings were unchanged from previous exams and he opined that Plaintiff was unable to push, pull, lift, or carry objects over five pounds, unable to sit, stand, or walk for more than 15 to 20 minutes, and was unable to cling, squat, kneel, crawl, bend, or twist for extended periods of time. (Tr. 504).

In May 2006, Martti Kahkonen, M.D., examined Plaintiff for the Butler County Department of Job and Family Services, and found that she had tenderness in her lower back. (Tr. 508-509). Straight leg raising test was positive bilaterally and Plaintiff had decreased range of motion. (Tr. 508). Dr. Kahkonen's assessment was a lumbosacral strain with a disc protrusion at L5-S1, as documented by the MRI. (Tr. 509). From his exam, Dr. Kahkonen opined that Plaintiff could not stand, walk, or sit for more than 15 minutes, could not lift more than five pounds, and was extremely limited in her ability to push/pull, bend, reach, handle, and perform repetitive foot movements, which he expected to last for 12 months or more. (Tr. 511).

Later in May 2006, Philip Minella, M.D., a neurosurgeon, attempted to examine Plaintiff, but since she weighed 341 pounds, he explained that he could not perform surgery because a surgical candidate must be 300 pounds or less. (Tr. 513).

In November 2006, David Grundy, M.D., examined Plaintiff for complaints of back, thumb, and knee pain. (Tr. 736). Plaintiff complained of tenderness in some of those areas, but Dr. Grundy found that Plaintiff's motor, sensory, and neurological

function was intact, she had no pain on extension or flexion of her knee, and straight leg raising test was negative.  (Tr. 737).

In his monthly exams from January through May 2007, Dr. Saleh diagnosed Plaintiff with lumbar spine problems, finding that Plaintiff had decreased range of motion in her back, decreased muscle power in her legs, positive straight leg raising tests bilaterally, and reduced reflexes, though use of a TENS unit and pain injections gave her some relief.  (Tr. 739-747, 771-773, 785-786, 789-791).  In March 2007, Plaintiff had a lumbar MRI that showed degenerative changes at T11-12, T12-L1, L4-5, and L5-S1, central disc protrusions at T11-12, T12-L1 causing stenosis at T11-12, and a prominent left disc protrusion at L5-S1.  (Tr. 769).  In April 2007, Plaintiff had a thoracic MRI that showed small disc protrusions causing narrowing of the nerve exits and mild stenosis of the tissue surrounding the thoracic spine.  (Tr. 768).

Also in April 2007, Dr. Saleh completed a functional capacity questionnaire, in which he reported decreased range of motion in Plaintiff's back and legs, decreased muscle power, decreased reflexes, a limp affecting Plaintiff's left leg, and a decrease in sensation in her lower left leg and foot.  (Tr. 763).  Dr. Saleh opined that Plaintiff was unable to walk or stand for prolonged periods and would need a job that permitted shifting positions at will from sitting, standing, or walking.  (Tr. 764-765).  Dr. Saleh opined that Plaintiff's legs should be elevated to waist level with prolonged sitting and she must use a cane when standing or walking.  (Tr. 765).  She opined that Plaintiff could occasionally twist, but should never stoop, crouch, or climb ladders or stairs.  (Tr. 766).

Dr. Saleh estimated that Plaintiff would miss more than four days per month as a result of her impairments or treatment. (*Id.*)

At Plaintiff's hearing in May 2007, Richard Hutson, M.D., testified as the medical expert. (Tr. 845-855). Dr. Hutson testified that there was not sufficient evidence to find that Plaintiff met or equaled Listing 1.04 based on her orthopedic conditions. (Tr. 850). Dr. Hutson opined that the functional limitations indicated by Dr. Ray in his 2004 examination continued to be appropriate. (Tr. 850-851). Dr. Hutson noted that Dr. Ray was a physical medicine and rehabilitation doctor, trained in conducting functional capacity evaluations. (*Id.*)

**Mental Health Evidence**

In November 2002, A.J. McNamara, M.A., began counseling Plaintiff for her mental health issues and he reported that Plaintiff's mood was moderately depressed and she was a bit tearful during his assessment. (Tr. 282). He diagnosed Plaintiff with major depression and noted that her global assessment of functioning ("GAF") score was 65, which indicated "some mild symptoms." (Tr. 283).

In January 2003, Mel Zwissler, Ph.D, a state agency psychologist, assessed Plaintiff's mental functional capacity. (Tr. 215-230). Dr. Zwissler opined that Plaintiff was able to perform work activities that were simple and routine, respond to changes and tolerate work stressors, and relate well with the public. (Tr. 217).

In March 2003, Alice Onady, M.D., a psychiatrist, began treating Plaintiff. (Tr. 264-265). She described Plaintiff as overweight and "sick looking," and noted that she

walked with a cane. (Tr. 265). Plaintiff's mood was dysphoric, her affect was appropriate but sad and tearful, she was pain-focused, she expressed feelings of hopelessness and helplessness, and she reported being isolative, having panic attacks, and worrying a lot. (*Id*.) Dr. Onady diagnosed Plaintiff with severe major depression, pain disorder, dysthymia, and a generalized anxiety disorder, and assigned her a GAF score of 40.[3] (*Id*.) Dr. Onady prescribed Plaintiff Zoloft and Ativan. (*Id*.) Also in March 2003, Mr. McNamara opined in a letter that Plaintiff's mental diagnoses rendered her unable to work for at least the next six months. (Tr. 320).

On May 1, 2003, Plaintiff reported feeling "a little better on Zoloft," and she was "less tearful" and "less hopeless." (Tr. 258). Dr. Onady opined that Plaintiff's ability to remember, understand, and follow directions was poor due to her depression, her ability to maintain attention was poor due to anxiety, and her ability to sustain concentration, persist at tasks, and complete them in a timely fashion was poor due to her physical problems and depression. (Tr. 256). She also opined that Plaintiff's abilities to socially interact and adapt were poor. (*Id*.)

At the end of May 2003, Roger Lewis, Ph.D., a state agency psychologist, assessed Plaintiff's mental functional capacity. (Tr. 284-301). Dr. Lewis noted that Plaintiff was depressed and anxious, which was mostly due to the limitations imposed by her physical problems and morbid obesity. (Tr. 286). Dr. Lewis opined that Plaintiff had the ability to

_____

[3] A GAF score of 40 indicates some impairment in reality testing or communication OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. DSM-IV-TR at 32.

perform simple routine tasks at a moderate pace in work settings with regular breaks, modest interpersonal demands, and predictable schedules and routines. (*Id.*) In a psychiatric review technique form, Dr. Lewis cited mental health treatment evidence from June 2000 to May 2003, and noted that Dr. Onady's previous opinion that Plaintiff functioned poorly in all areas was "not consistent with the psychologists' progress notes of 11/02 through 5/03 which indicated mostly physical limitations." (Tr. 301). Dr. Lewis concluded that the weight of the evidence suggested that Plaintiff had "moderate limitations with [a] residual mental capacity for simple tasks." (*Id.*)

In September 2003, Mr. McNamara completed a form in which he opined that Plaintiff's major depression rendered her unable to perform work but expected her to return to work in September 2004. (Tr. 319). Mr. McNamara continued counseling Plaintiff once or twice a month from September 2003 through November 2004. (Tr. 453-455, 457, 460- 461, 463-466, 467-472). Plaintiff's mood ranged from happy to moderately depressed, and her behavior ranged from anxious to talkative and relaxed. (*Id.*)

From February 2005 through May 2005, Deborah Nagel, M.A., L.S.W., counseled Plaintiff once or twice a month and noted that Plaintiff's mood was usually slightly depressed and her behavior ranged from anxious to talkative and relaxed. (Tr. 445-447, 449-451).

Plaintiff also met with Dr. Onady every two to four months from September 2003 to February 2007. (Tr. 436, 448, 452, 456, 458, 462, 466, 473, 748-755). Dr. Onady's

usual diagnosis was major depression, pain disorder, and general anxiety disorder. (*Id.*) Dr. Onady's notes for these sessions mainly contain reports by Plaintiff of her physical problems and pain, along with any family problems she was currently having. (*Id.*)

In March 2007, Dr. Onady completed a questionnaire in which she opined that Plaintiff had marked limitation in all areas of mental functioning. (Tr. 760). She anticipated that Plaintiff would miss more than four days of work per month as a result of her impairment or treatment, and she expected Plaintiff's impairment to last at least 12 months. (Tr. 761). Dr. Onady noted that Plaintiff's GAF score was 52,[4] and her highest in the past year was 65. (Tr. 758).

Mary Buban, Psy.D., provided expert psychological testimony at Plaintiff's May 2007 hearing, opining that Plaintiff should be limited to low stress work with no production quotas and no fast paced work. (Tr. 858). Dr. Buban also testified that Plaintiff should be restricted to occasional public contact. (Tr. 859). Dr. Buban opined that Dr. Onady's assessment of marked impairment in all major mental functioning areas was not supported by the treatment record and opined that Plaintiff was uniformly described in the record as pleasant and cooperative, and her depressive symptoms were secondary to her physical pain. (Tr. 858)

**Statements from Plaintiff**

At her June 2004 hearing, Plaintiff testified that she had pain in her low back that

_____

[4]    A GAF score betwen 51-60 indicates moderate symptoms OR any moderate social, occupational, or school functioning. DSM-IV-TR at 32.

radiated down her left leg. (Tr. 816). Her medication sometimes reduced her pain, depending on the level of pain. (*Id.*) Plaintiff testified that she received four nerve blocks that helped reduce her pain for four months. (Tr. 817). She testified that her depression and anxiety caused her to have crying fits about once a week. (Tr. 819). Plaintiff said that she mostly watched television during the day, either in a reclined position or on her bed. (Tr. 820). She said her other activities were limited because she could not stand or sit in one place for very long. (Tr. 820-822). Plaintiff testified that she could walk 20 feet, could stand four to five minutes, could sit five to ten minutes at a time, and could lift up to five pounds. (Tr. 823-824).

At Plaintiff's May 2007 hearing, she testified that her medication had a minimal effect on her pain. (Tr. 841).

Plaintiff argues that the ALJ should have given the most weight to the opinions of Dr. Saleh and Dr. Onady, and when he rejected their opinions, he should have given good reasons for the rejection. (Doc. 5 at 10). However, a treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight only if it is supported by medical findings and is consistent with substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d). An ALJ may decline to afford treating physicians even substantial weight, as long as he minimally articulates his reasons. *See id.*

In the ALJ's decision, he provided an eight-page, extensive summary of the medical evidence. (Tr. 23-31). He also dedicated four pages of his decision to set forth

the rules for evaluating medical opinion evidence, and to explain his consideration and weighing of the medical source opinions in the record. (Tr. 35-39). Therefore, Plaintiff's contention that the ALJ did not provide a reasoned analysis for rejecting the opinions of Dr. Saleh and Dr. Onady is without merit. As the ALJ concluded in his decision, the opinions of Dr. Saleh and Dr. Onady were not entitled to controlling or even deferential weight because they were "not supported by proportionate objective findings in the record" and were contradicted by the medical and psychological expert testimony, and the findings of the state agency reviewers. (Tr. 38).

Further, it is noted that the ALJ's RFC finding accounted for many of Dr. Saleh's and Dr. Onady's recommended limitations. (Tr. 34). However, the ALJ did reject their conclusory opinions that Plaintiff was unable to work, as those were administrative findings reserved for the Commissioner. *See* 20 C.F.R. § 404.1527(e). As for the specific limitations not adopted by the ALJ, he provided a reasonable analysis that supported his conclusions. Under 20 C.F.R. § 404.1527(f) and SSR 96-2p, the ALJ considered medical and psychological expert opinions to determine if the treating source opinions were well-supported and consistent with other substantial evidence in the case record. *See* SSR 96-2P.

In this case, the ALJ obtained an expert medical opinion from Dr. Hutson to assist him with understanding the significance of the medical findings. (Tr. 845-855). Dr. Hutson explained that the opinion offered by Dr. Saleh was not supported by the objective medical evidence in the record and conflicted with the opinion offered by

Dr. Ray in 2004. (Tr. 851). Dr. Ray concluded that Plaintiff was limited, but still could perform a range of sedentary work. (*Id.*) Dr. Hutson provided a thorough and detailed explanation of why Dr. Saleh's opinion was lacking in medical support, and in particular, pointed out that the medical evidence did not demonstrate a worsening in Plaintiff's condition that justified a significant departure from the opinion offered by Dr. Ray in 2004. (Tr. 850-852, 854). Dr. Hutson also noted that Dr. Ray was a rehabilitation specialist who was trained to provide functional evaluations, and in this context, his opinion was especially reliable. (Tr. 850-851). Because Dr. Saleh's opinion conflicted with the opinions offered by two other physicians (the medical expert and a rehabilitation specialist), and the ALJ's decision echoed the rationale forwarded by Dr. Hutson for concluding that Dr. Saleh's opinion lacked sufficient medical support, Plaintiff has not established that the ALJ's lengthy explanation of his weighing of Dr. Saleh's opinion was unreasonable. *See* 20 C.F.R. § 404.1527(d)(3-4).

As for Plaintiff's mental limitations, the ALJ pointed out that the opinions of Dr. Onady and Mr. McNamara were not supported by substantial evidence. (Tr. 38). In November 2002, Mr. McNamara opined that Plaintiff's GAF score was 65, indicating that she was only having "some mild symptoms." DSM-IV-TR at 34. In January 2003, Dr. Zwissler opined that Plaintiff was able to perform work activities that were simple and routine, respond to changes and tolerate work stressors, and relate well with the public. (Tr. 217). However, in March 2003, Dr. Onady assigned Plaintiff a GAF score of 40, despite the minimal amount of evidence contained in her treatment notes that

suggested Plaintiff had "major impairment in several areas." (*Id.*) In fact, her treatment notes from May 2003 actually noted improvement in Plaintiff's condition. (Tr. 258).

Despite the noted improvement and lack of supporting evidence, Dr. Onady opined later in May 2003 that Plaintiff was functioning poorly in several areas. (Tr. 256). However, Dr. Lewis also assessed Plaintiff's mental functional capacity in May 2003 and he highlighted the fact that Plaintiff's depression and anxiety stemmed mostly from her physical problems and morbid obesity. (Tr. 286). Dr. Lewis opined that Plaintiff had the ability to perform simple routine tasks at a moderate pace in work settings with regular breaks, modest interpersonal demands, and predictable schedules and routines. (*Id.*)

Specifically addressing Dr. Onady's severely limiting opinion, Dr. Lewis opined that her opinion was inconsistent with Plaintiff's progress notes and the evidence suggested that Plaintiff had only "moderate limitations with [a] residual mental capacity for simple tasks." (Tr. 301). Because Dr. Onady's opinion was inconsistent with her own treatment notes and those of Mr. McNamara, as well as Dr. Lewis' opinion, the ALJ had a reasonable basis for not giving her opinion significant weight.

Dr. Onady's March 2007 opinion that Plaintiff had marked limitation in all areas of mental functioning was also contrary to Plaintiff's treatment notes. (Tr. 39). Dr. Buban, the psychological expert, opined that Plaintiff's medical records showed that her mental impairments consisted of a depressive condition, which was attributed to pain and psychosocial stressors within the home, and generalized anxiety disorder, which did not support Dr. Onady's severely restrictive opinion. (Tr. 856-858). Dr. Buban highlighted

the fact that Plaintiff did not have a history of hospitalization or crisis intervention. (Tr. 856). She testified that treatment notes describing Plaintiff as "a pleasant woman, cooperative and depression is secondary to pain" did not substantiate Dr. Onady's severely restrictive opinion. (Tr. 858).

In his decision, the ALJ highlighted additional inconsistencies with Dr. Onady's opinion and the treatment notes. (Tr. 39). Specifically, Dr. Onady's finding that Plaintiff's GAF score was 52 in March 2007, and had been as high as 65 in the past year, was directly contrary to her finding that Plaintiff had marked limitations in all areas of mental functioning. (Tr. 758). Rather, such GAF scores suggested Plaintiff had only mild to moderate limitations. (*Id*.) Because Dr. Onady's opinions lacked internal support and conflicted with other treatment notes and the opinions of three other psychologists, the ALJ had a reasonable basis for not giving her opinions significant weight.

Upon careful review, the undersigned finds that substantial evidence exists to support the ALJ's RFC.

## B.

For her next assignment of error, Plaintiff claims that the ALJ erred by giving inadequate consideration to her credibility.

Plaintiff argues that the ALJ should have given Plaintiff's testimony more weight. (Doc. 5 at 12). However, Plaintiff's statements as to "pain or other symptoms will not alone establish that [she is] disabled." 20 C.F.R. § 404.1529(a). The ALJ must consider a number of other factors when making a disability determination. *Id*. § 404.1529(c)(3).

Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

When considering a claim for disability based on pain, the Court is guided by the Sixth Circuit's instruction that, initially, there must be objective evidence of an underlying medical condition. *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). If such evidence exists, there must be objective medical evidence to confirm the severity of the alleged pain arising from that condition, or the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged disabling pain. *Id.; see also Felisky*, 35 F.3d at 1038-39.

Moreover, it is within the discretion of the ALJ, who actually meets with and takes testimony from an individual plaintiff, to evaluate that plaintiff's credibility. As the Sixth Circuit has found: "[i]t is for the [Commissioner], not a reviewing court, to make credibility findings." *Felisky*, 35 F.3d at 1036; *see also McGuire v. Comm'r of Soc. Sec.*, No. 98-1502, 1999 WL 196508, at *6 (6th Cir. Mar. 25, 1999) (*per curiam*) ("An ALJ's findings based on the credibility of an applicant are to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing a witness's demeanor and credibility.").

The ALJ noted in his credibility assessment of Plaintiff's subjective complaints that she "undoubtedly has significant functional limitations associated with her impairments." (Tr. 39). However, the ALJ noted that the evidence did not establish that Plaintiff's

impairments rendered her totally disabled from all work activity. (*Id.*) In March 2003, Plaintiff reported that her pain was only a three out of ten when she took her medication (Tr. 308). In July 2004, she reported that steroid injections, use of a TENS unit, and other medication helped lessen her pain. (Tr. 327). Dr. Saleh also consistently noted that Plaintiff experienced some relief with the TENS unit, and the administration of therapeutic blocks and pain injections. (*See, e.g.*, Tr. 398, 427, 530, 588, 632, 675, 771-773, 789-791).

The ALJ also found that Plaintiff's histrionic behaviors significantly detracted from her credibility. (Tr. 39). For example, Plaintiff did not cooperate with Dr. Ray during his physical exam by displaying many pain behaviors, exerting poor effort, giving away, and moaning and groaning. (Tr. 329, 333). Plaintiff also wore an oxygen mask to the hearing, though the record did not support a need for such action. (Tr. 35, 39).

The ALJ considered Plaintiff's daily activities, but reasonably concluded that there was "no medical reason for her to be so limited, nor is there any independent corroboration by reliable third parties that she is so limited." (Tr. 40). In June 2003, Dr. Caldwell opined that Plaintiff's allegations were only partially credible. (Tr. 306). As discussed above, Dr. Ray, Dr. Hutson, Dr. Zwissler, Dr. Lewis, and Dr. Buban opined that Plaintiff was not as functionally limited as she alleged. Because substantial evidence supported the ALJ's finding that Plaintiff received some relief with treatment and her symptoms did not render her disabled, the ALJ had a reasonable basis for discounting her credibility. Accordingly, the ALJ properly concluded that Plaintiff's complaints of adisabling condition were not fully credible.

## C.

For her third and final assignment of error, Plaintiff maintains that the ALJ erred by relying on an improper hypothetical to the vocational expert which did not constitute substantial evidence of her vocational abilities.

Plaintiff argues that the ALJ's hypothetical question should have taken into consideration the opinions of Dr. Saleh and Dr. Onady with respect to the number of days of work they estimated she would miss each month as a result of her impairments or treatment. (Doc. 5 at 13). However, as discussed above, it is the Commissioner's position that the ALJ's RFC finding was supported by substantial evidence, including the opinions of Dr. Ray, Dr. Hutson, Dr. Zwissler, Dr. Lewis, and Dr. Buban – none of which opined that Plaintiff's impairments or treatment would cause her to miss any work. Since the ALJ relied on the VE's response to a hypothetical question based on Plaintiff's RFC, the ALJ was permitted to consider the VE's response as substantial evidence in support of his decision. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

## III.

For the foregoing reasons, Plaintiff's assignments of error are unavailing. The ALJ's decision is supported by substantial evidence and should be affirmed.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner, that Plaintiff was not entitled to disability

income benefits, be found **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and

**AFFIRMED**; and, as no further matters remain pending for the Court's review, this case

be **CLOSED.**


Date:  November 27, 2009         s/ Timothy S. Black
                                 Timothy S. Black
                                 United States Magistrate Judge

DEBORAH PUCKETT,            :      Case No. 1:08-cv-771
                                    :

       Plaintiff,             :      Judge S. Arthur Spiegel
                                    :      Magistrate Judge Timothy S. Black

vs.                         :
                                    :

COMMISSIONER OF          :
SOCIAL SECURITY,        :
                                    :

       Defendant.          :

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **TEN DAYS** after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to **THIRTEEN DAYS** (excluding intervening Saturdays, Sundays, and legal holidays) when this Report is being served by mail and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within **TEN DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 (1985).